**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

KPG Healthcare LLC,

              Plaintiff,

v.

LaborEdge LLC,

              Defendant.

No. CV-25-00769-PHX-DWL

**ORDER**

      KPG Healthcare, LLC ("Plaintiff") is an Arizona-based healthcare staffing company that entered into a software agreement in May 2024 with LaborEdge, LLC ("Defendant"), a Michigan-based software provider. Plaintiff made an initial payment of $39,500 but became dissatisfied with Defendant's software almost immediately after signing the contract. After Defendant allegedly refused to address Plaintiff's concerns and sought more than $500,000 in additional payments, Plaintiff brought this action, asserting various tort and contract claims against Defendant as well as a claim for declaratory relief.

      Now pending before the Court is Defendant's motion to dismiss. (Doc. 17.) After the motion became fully briefed (Docs. 22, 25), the Court issued a tentative ruling (Doc. 31) and the parties then stipulated to vacate oral argument and submit on the tentative (Doc. 32). For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

      The following facts are derived from Plaintiff's operative pleading, the First Amended Complaint ("FAC") (Doc. 14), and the software agreement between the parties

("Software Agreement") (Doc. 17-1 at 6-29.)[1]

I.    The Parties

Plaintiff is an Arizona-based "healthcare staffing company." (Doc. 14 ¶ 16.)

Defendant "is a Michigan-based company engaged in the provision of SaaS [software as a service] billing and CRM [customer relationship management] software solutions." (*Id.* ¶ 17.) Defendant "holds itself out as the leading technology provider in the Healthcare Staffing industry, claiming to provide its customers with powerful technology to manage critical operations, attract and retain the best healthcare talent, and fortify their partner relationships." (*Id.* ¶ 18.) Defendant "represents that it is committed to providing the most robust staffing solutions available while continuously reinvesting in its technology." (*Id.* ¶ 19.) Defendant's software products are "specifically tailored to healthcare staffing," and Defendant "promises to back [up its promises] with steady investments in [Defendant's] implementation, training, service, support, and engineering." (*Id.* ¶ 20.)

II.    Pre-Contractual Discussions

As a healthcare staffing company, Plaintiff "sought a [software] provider that could implement a billing and CRM system to enable it to provide outward facing billing and invoicing to its clients, including direct billing, while also providing inward facing tools to analyze and report on revenues and profits generated." (*Id.* ¶ 21.)

From January through March 2024, Defendant "presented several sales demonstrations, and scheduled and conducted meetings with [Plaintiff] . . . in order to present its supposed capabilities." (*Id.* ¶ 22.) "[S]ales demonstrations and calls" took place on January 3, 5, 10, and 18, on February 1, 20, and 21, and on March 5 and 11. (*Id.*) Each

---

[1]    "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908. The Court may consider the Software Agreement because it is incorporated by reference throughout the FAC.

of these "meetings and sales demonstrations were scheduled and led by [Defendant's] Director of Sales, Josh Tabit" ("Tabit").  (*Id.* ¶ 23.)

Plaintiff alleges that "these pitches were intentionally controlled and choreographed demonstrations that did not allow [Plaintiff] to have any hands-on usage or training, leading [Plaintiff] to rely on the manner in which [Defendant's] agents showed select applications of its services and software." (*Id.* ¶ 24.)  These sales pitches "gave a deliberately skewed, incomplete, and false impression of the software's capability, purported ease of implementation, and its purported ability to meet specific business needs of [Plaintiff] and its clients."  (*Id.*)[2]

On January 5 and February 20, 2024, "Tabit led virtual sales demonstrations of [Defendant's] Back Office," and those sales demonstrations were attended by Plaintiff's Steve Crane and Joe Gossman, among others. (*Id.* ¶ 25.)  During those two demonstrations, Tabit "falsely represented that its [S]oftware can provide direct billing capabilities, generate accounts receivable, and increase revenue for [Plaintiff's] billing services." (*Id.* ¶ 26.)  Tabit "also falsely represented the nature of its [S]oftware's invoicing, candidate expense and reimbursement tracking, data migration, and reporting functionality."  (*Id.* ¶ 27.)

Defendant "also intentionally and materially concealed that [its] client billing is limited to timesheet entries, and expense reimbursements are not associated as income and expenses on a per account profit and loss basis." (*Id.* ¶ 28.)  Plaintiff alleges that had it "known of this material omission, it would not have entered any agreement with" Defendant.  (*Id.*)  And Plaintiff alleges that it "relied on these and other material misrepresentations" when it "engaged [Defendant], paying an initial sum of $39,500," and it "would not have engaged [Defendant] and would not have paid [Defendant] any money had it known the truth of what [Defendant] misrepresented and concealed.  (*Id.* ¶¶ 29-30.)

…

---

[2]    The software underlying the Software Agreement will be referred to herein as the "Software."

III.    <u>The Software Agreement</u>

On May 6, 2024, the parties executed the Software Agreement. (*Id.* ¶ 31.)[3] Plaintiff alleges that it "would not have entered the [Software] Agreement had it known the truth of what [Defendant] misrepresented and concealed." (*Id.* ¶ 32.) The FAC alleges that, under the Software Agreement, Defendant was to provide Plaintiff "with a license and subscription that includes all updates and upgrades for the core product, which consists of ATS, LEAP, and StaffingFuel as well as LaborEdge Healthcare Worker Mobile App and hosting services related thereto." (*Id.* ¶ 33.)

The Software Agreement contains several provisions relevant to the dismissal analysis, which are excerpted below:

> The foregoing documents make up the entire contract between [Defendant] and [Plaintiff]. No other terms and conditions shall be binding upon [Defendant], except to the extent [Defendant] expressly accepts such terms and conditions in writing by an authorized [Defendant] representative.

(Doc. 17-1 at 7.)

> [Defendant] grants to [Plaintiff] and [Plaintiff] accepts from [Defendant], a limited, non-transferable, non-sub-licensable, revocable subscription license to access and use [Defendant's] healthcare staffing software . . . solely for [Plaintiff's] internal business use.

(*Id.* at 9 § 1.)

> [T]he Software will not be installed on any servers or other computer equipment owned or controlled by [Plaintiff], or otherwise furnished to [Plaintiff].

(*Id.*)

> The subscription includes all updates and upgrades for the core product, which consists of ATS, LEAP, and StaffingFuel.

---

[3]     Although the FAC alleges that the Software Agreement was "for billing and CRM services related to locum tenens staffing" (Doc. 14 ¶ 31), the Software Agreement itself, which is incorporated by reference into the FAC, does not specifically mention billing services (Doc. 17-1 at 6-29).

(*Id.*)

> [Plaintiff] may retain [Defendant] to perform services ("Professional Services") pursuant to a written statement of work, work authorization form, or work order ("Statement of Work" or "SOW") signed by both Parties. Professional Services shall be subject to all terms and conditions of this [Software] Agreement, and the terms of the SOW. [Defendant] will use reasonable efforts to deliver any work product which is expressly stated as a [Defendant] responsibility or obligation to deliver in a SOW. Any dates for [Defendant] performance specified in a SOW shall be estimates only.

(*Id.* at 11 § 10(a).)

> Except as otherwise mutually agreed in a SOW, [Plaintiff] accepts the Professional Services and associated work product upon written confirmation that it complies with [Plaintiff] requirements as specific in the SOW.

(*Id.* at 11 § 10(b).)

> [Defendant] warrants that . . . it will take commercially reasonable efforts so that the Software will perform in all material respects to provide the functionality of [Defendant's] current release and updates as they are issued . . . . [Plaintiff] agrees to promptly report performance issues with the Software or Professional Services work product in writing to [Defendant] customer support. Upon receiving a report of a performance issue from [Plaintiff], [Defendant] will, upon verifying a breach of this limited warranty provide, as [Plaintiff's] exclusive remedy, commercially reasonable maintenance to resolve the issue in conformity with this limited warranty.

(*Id.* at 12 § 11(a).)

> [Defendant] represents and warrants that the Software will function as represented and is fit for the purpose it has been designed.

(*Id.* at 12-13 § 11(b).)

> The warranties expressly stated in this Section 11 are the sole and exclusive warranties offered by [Defendant]. . . . [Plaintiff] acknowledges that . . . except as expressly stated herein, the Service and the Software are provided to [Plaintiff] on an "as is" and "as available" basis, and are for [Plaintiff's] internal commercial use only . . . . [Plaintiff] assumes all responsibility for determining whether the Service or the information generated thereby is

> accurate or sufficient for [Plaintiff's] purposes. . . . [Plaintiff] represents that it is not relying on any representation of [Defendant] that is not expressly stated in this [Software] Agreement, and that [Plaintiff] accepts sole and complete responsibility for: (i) the selection of the Software to achieve [Plaintiff's] intended results; (ii) use of the Software; (iii) the results obtained from the Software; and (iv) performance of any contract between [Plaintiff] and any third party.

(*Id.* at 13 § 11(c).)

> This [Software] Agreement, together with any Exhibits, Attachments, Schedules, and Statements of Work, shall constitute the entire [Software] Agreement between the Parties. This [Software] Agreement supersedes all prior oral and written communications, agreements, and understandings of the Parties with respect to the subject of this [Software] Agreement.

(*Id.* at 17 § 28.)

> This [Software] Agreement shall be governed by and construed under the substantive and procedural laws of the state of Michigan and the United States without regard to conflicts of law provisions thereof. Each Party shall submit to the jurisdiction of, and agrees that venue is proper in, the State of Michigan with respect to litigation arising from or relating to the Software or this [Software] Agreement.

(*Id.* at 17 § 29.)

IV.    <u>Post-Contractual Developments</u>

"During the summer of 2024, invoicing functionality problems with [Defendant's] Nexus system and its configuration began to surface. In particular, the billing and CRM system that [Defendant] had designed and installed did not adequately support [Plaintiff's] business needs to directly bill many of its customers, including, specifically, deficiencies with the functionality of [Defendant's] Nexus system's Locum Tenens functionality." (Doc. 14 ¶ 34.) "This lack of functionality directly contradicted" the representations made by Tabit. (*Id.* ¶ 35.)

Plaintiff "identified these weaknesses and concerns" and "shar[ed] them with [Defendant's] implementation and product development teams"—and Defendant "did not dispute these concerns and deficiencies" and "committed to address the shortcomings."

(*Id.* ¶ 36.)  "However, over the ensuing months, [the Software] failed to meet promised functionality, and still could not perform direct billing adequately, and was thus unable to go live by the agreed-upon deadline in October 2024."  (*Id.* ¶ 37.)

On October 9, 2024, Plaintiff notified Defendant of its "failure to meet the stated deadline(s)" and "invoicing issues," "requesting that they be cured promptly."  (*Id.* ¶ 38.)  Plaintiff "requested specific development solutions to improve the [S]oftware, but [Defendant] failed to integrate them or rectify the defects."  (*Id.* ¶ 39.)

Plaintiff "eventually determined that the implementation timeline remained uncertain, that no apparent solution had been developed, that [Plaintiff] would be required to commit excessive resources and time to engage in multiple rounds of testing and that, even then, there were not adequate assurances that [Defendant] would be able to deliver a functioning system that met the identified needs of [Plaintiff] within a reasonable timeframe that did not inordinately compromise [Plaintiff's] business needs."  (*Id.* ¶ 40.)

Thereafter, Plaintiff "attempted on several occasions, consistent with the terms of the [Software] Agreement, to resolve these issues with [Defendant], but [Defendant] refused to acknowledge, rectify and/or cure its failures," and instead Defendant "continues to demand an additional payment of in excess of $500,000 from [Plaintiff]."  (*Id.* ¶ 41.)

The FAC alleges that, "[u]nder the terms of the [Software] Agreement, the services and products that [Defendant] agreed to provide were not to be deemed completed until receiving written confirmation from [Plaintiff] that the services and products complied with [Plaintiff's] requirements."  (*Id.* ¶ 42.)  But Plaintiff "never confirmed that [Defendant's] work, services and/or product deliverables met its requirements or were completed."  (*Id.* ¶ 43.)

## DISCUSSION

### I.    Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (citation omitted).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The court may also dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

## II. Counts One and Two: Fraud/Fraudulent Inducement and Negligent Misrepresentation

In Count One of the FAC, titled "Fraud/Fraudulent Inducement," Plaintiff alleges that Defendant "made false representations concerning material facts to [Plaintiff] in compelling [Plaintiff] to enter into the [Software] Agreement." (Doc. 14 ¶ 47.) Specifically, Plaintiff alleges that during pre-contractual "sales demonstrations," Tabit "falsely represented that [Defendant's] [S]oftware can provide direct billing capabilities, generate accounts receivable, and increase revenue for [Plaintiff's] billing services" and "also falsely represented the nature of [the] [S]oftware's invoicing, candidate expense and reimbursement tracking, data migration, and reporting functionality." (*Id.* ¶¶ 48-49.) Plaintiff further alleges that Defendant "intentionally and materially concealed that [Defendant's] client billing is limited to timesheet entries, and expense reimbursements are not associated as income and expenses on a per account profit and loss basis, knowing that such withheld information was material to [Plaintiff's] decision to enter into the [Software] Agreement." (*Id.* ¶ 50.) Plaintiff alleges that Defendant "knew or should have known that the material representations it made and the information it supplied to [Plaintiff] as a precondition of the [Software] Agreement were false" and that Plaintiff "reasonably relied on [Defendant's] material representations." (*Id.* ¶¶ 51-52.) Plaintiff alleges that Defendant

"knew or should have known that": (1) "the products and services that it offered were not able to meet [Plaintiff's] requirements and needs, including but not limited to the ability to directly bill clients"; and (2) "that implementing the base product with only standard functionality absent the necessary Locums functionality would not prove adequate to meet [Plaintiff's] stated requirements"—and Defendant instead "intentionally withheld or misrepresented the nature of this aspect of the [S]oftware." (*Id.* ¶¶ 53-54.) Plaintiff alleges that it "would not have entered the [Software] Agreement had it known [Defendant's] representations were false" or "had it known the material information [Defendant] intentionally withheld." (*Id.* ¶ 55-56.)  Count One seeks rescission, "damages to restore [Plaintiff] to the position it was in before entering the [Software] Agreement," and punitive damages.  (*Id.* ¶¶ 57-58.)

In Count Two, titled "Negligent Misrepresentation," Plaintiff alleges that Defendant "owed a duty to make complete, accurate and truthful disclosures and representations to [Plaintiff]" and that "[Defendant] negligently provided [Plaintiff] with false, incorrect, inaccurate, and/or incomplete information, and/or omitted information regarding the subject matter of the [Software] Agreement."  (*Id.* ¶¶ 61-62.)  Count Two points to the same misrepresentations and omissions as Count One. (*Id.* ¶¶ 63-65.)  Plaintiff alleges that Defendant "knew or should have known" of the statements' falsity and/or "failed to exercise reasonable care in providing the information to [Plaintiff]." (*Id.* ¶ 66.)  As in Count One, Plaintiff seeks rescission and "damages to restore [it] to the position it was in before entering into the [Software] Agreement." (*Id.* ¶ 70.)

Defendant identifies three reasons why Counts One and Two should be dismissed: (1) non-compliance with Rule 9(b); (2) the economic loss rule ("ELR"); and (3) parol evidence and reasonable reliance.  (Doc. 17 at 10-17.)  Each is addressed below.

A.    **Rule 9(b)**

1.    The Parties' Arguments

Defendant first seeks the dismissal of Counts One and Two on the ground that Plaintiff "has failed to plead fraud or negligent misrepresentation in accordance with the

requirements of Rule 9(b)."  (Doc. 17 at 11-14.)

In response, Plaintiff argues that, under Rule 9(b), it "has sufficiently pled the required elements to state a claim for fraudulent inducement" (Doc. 22 at 4) as well as for negligent misrepresentation (*id.* at 9).

### 2. Legal Standard

Both sides agree that Counts One and Two are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  (Doc. 17 at 10-14; Doc. 22 at 4-10.) Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as what is false or misleading about the purportedly fraudulent statement, and why it is false."  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (cleaned up).  *See also Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ("We have interpreted Rule 9(b) to mean that the pleader must state the time, place, and specific content of the false representations as well as the identifies of the parties to the misrepresentation.").  "The circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (cleaned up).

### 3. Analysis

Defendant does not appear to challenge Plaintiff's compliance with the "who," "when," or "where" requirements.  At any rate, those requirements are satisfied: (1) the FAC alleges that Tabit made the allegedly false representations (Doc. 14 ¶¶ 48-49, 63-64); (2) although the FAC alleges that sales demonstrations occurred on nine different dates (*id.* ¶ 22), Counts One and Two specify that the challenged misrepresentations were made during two of those sales demonstrations "on January 5 and February 20, 2024" (*id.* ¶¶ 48, 63); and (3) Counts One and Two also specify that the misrepresentations occurred "during sales demonstrations of [Defendant's] Back Office" (*id.*).

Defendant does challenge Plaintiff's compliance with the "what" requirement, arguing that Plaintiff "fail[s] to identify any actual 'representations.'" (Doc. 17 at 13.) On the one hand, the FAC alleges that Tabit "falsely represented that [Defendant's] [S]oftware can provide direct billing capabilities, generate accounts receivable, and increase revenue for KPG's billing services." (Doc. 14 ¶¶ 48, 63.) The FAC also alleges that Defendant "concealed" that its "client billing is limited to time sheet entries, and expense reimbursements are not associated as income and expenses on a per account profit and loss basis." (*Id.* ¶¶ 50, 65.) These allegations are sufficient to meet Rule 9(b)'s "what" requirement. On the other hand, the FAC alleges that Tabit "also falsely represented the nature of [Defendant's] [S]oftware's invoicing, candidate expense and reimbursement tracking, data migration, and reporting functionality." (*Id.* ¶¶ 49, 64.) To the extent this allegation was intended to encompass additional false statements beyond those stated with particularity in paragraphs 48, 50, 63, and 65, it was insufficient—vaguely claiming that Tabit "falsely represented the nature of" the Software does not speak to the content of Tabit's representations and fails put Defendant on notice of what, precisely, Tabit said about the Software's nature. *Cf. Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653, 662 (E.D. Mich. 2022) (dismissing fraud count in which plaintiffs alleged that "Defendant acting through its agents made material representations regarding the nature and scope of its insurance coverage" because such an allegation does not allege the "content of any alleged misrepresentations").

Finally, Defendant challenges Plaintiff's compliance with the "how" requirement. This challenge has merit. It is unclear from the FAC whether the misrepresentations attributed to Tabit were made orally, or whether, for example, they were presented on a slideshow or provided in written materials during the sales demonstrations. As Defendant correctly notes, at least one plausible reading of the FAC is that "these 'representations' were merely embodied in the allegedly 'skewed' sales presentations." (Doc. 17 at 12.) Because it is impossible to tell from context in the FAC how the alleged misrepresentations were made, Counts One and Two fail to satisfy Rule 9(b)'s heightened pleading standard.

1    *Compare Lytikainen v. Schaffer's Bridal LLC*, 409 F. Supp. 3d 767, 778 (D. Ariz. 2019)

2    (although "the complaint doesn't expressly allege *how* these representations were made,"

3    and "Rule 9(b) requires particular allegations concerning the 'how' of the fraud, the

4    contextual details supplied by the complaint make clear that the representations were made

5    orally").

6        Defendant also argues that the FAC "fails to allege that [Tabit] knew any such

7    representations were false." (Doc. 17 at 13.) But Count One alleges that Defendant "knew

8    or should have known that the material representations it made and the information it

9    supplied . . . were false." (Doc. 14 ¶ 51.) And Count Two alleges that Defendant "knew

10   or should have known that its representations were false." (*Id.* ¶ 66.) As Plaintiff notes in

11   its response (Doc. 22 at 6), under Rule 9(b) "[m]alice, intent, knowledge, and other

12   conditions of a person's mind may be alleged generally." Defendant has failed to explain

13   how these allegations in the FAC violate the Rule 9(b) standard for pleading knowledge

14   generally.[4]

15        B.    **The Economic Loss Rule**

16            1.    The Parties' Arguments

17        Defendant next argues that Counts One and Two are governed by Michigan law, by

18   virtue of the choice-of-law provision in the Software Agreement, but regardless of whether

19   Arizona or Michigan law applies, those claims are barred by the ELR. (Doc. 17 at 6-7, 14-

20   16.)

21        In response, Plaintiff argues that under the applicable choice-of-law test, Arizona

22   law should govern its tort claims. (Doc. 22 at 4.) Regardless, Plaintiff argues that the ELR

23   is inapplicable under both Arizona and Michigan law, primarily because both states

24   _____

25   [4]        The final argument in the Rule 9(b) portion of Defendant's motion is that any
     "intentional concealment," "fraudulent concealment," or "silent fraud" claim fails under
26   Arizona and Michigan law. (Doc. 17 at 13-14.) But this is not a Rule 9(b) argument—
     rather, it is a challenge to the substantive validity of Counts One and Two. In any event,
27   Count One is denominated as a "Fraud/Fraudulent Inducement" claim and Count Two is
     denominated as a "Negligent Misrepresentation" claim. It is therefore unnecessary, at least
28   at this stage of the case, to evaluate the theoretical sufficiency of any claim for "intentional
     concealment," "fraudulent concealment," or "silent fraud" or to evaluate whether Counts
     One and Two could be partially based on such a theory.

recognize certain fraud-based exceptions to the rule. (*Id.* at 10-11.) Plaintiff argues in the alternative that the ELR is inapplicable where, as here, the requested remedy is rescission. (*Id.* at 12.)

In reply, Defendant argues that Plaintiff's "tort claims are governed by Michigan law according to the choice-of-law provision in the [Software] Agreement" and, alternatively, under the Restatement's "most significant relationship" test. (Doc. 25 at 5-7.) Defendant also expands on its argument that the ELR should be deemed applicable here under both Arizona and Michigan law. (*Id.* at 7-11.)

### 2. Governing Law

Section 29 of the Software Agreement, titled "Governing Law," provides:

> This [Software] Agreement shall be governed by and construed under the substantive and procedural laws of the state of Michigan and the United States without regard to conflicts of law provisions thereof. Each Party shall submit to the jurisdiction of, and agrees that venue is proper in, the State of Michigan with respect to litigation arising from or relating to the Software or this [Software] Agreement.

(Doc. 17-1 at 17.) The first sentence is the parties' choice-of-law provision; the second sentence is a forum-selection clause.

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits—here, Arizona. *See, e.g.*, *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law."). Under Arizona law, "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision. Rather, they are decided according to the law of the forum state." *Winsor v. Glasswerks PHX, L.L.C.*, 63 P.3d 1040, 1043-44 (Ariz. Ct. App. 2003) (cleaned up). Although Plaintiff places heavy emphasis on this principle (Doc. 22 at 4), Plaintiff overlooks that it merely identifies the rule that Arizona courts "ordinarily" apply, which is subject to a significant exception: "[C]ontractual choice of law provisions may apply to tort claims under certain circumstances: Whether a choice of law provision applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." *Winsor*, 63 P.3d

at 1044 (cleaned up). As a result, Arizona federal courts sitting in diversity have concluded that when the resolution of a particular tort claim relates to interpretation of the parties' contract, it should be governed by the law of the state specified in the parties' contractual choice-of-law provision, even if (as here) that provision by its terms only encompasses contract and not tort claims. *See, e.g.*, *Honeywell Int'l Inc. v. Forged Metals Inc.*, 2019 WL 5960063, *2 (D. Ariz. 2019) ("The parties debate whether the General Purchase Order Provision that requires New York law to govern '[t]he construction, interpretation and performance' of the agreement and 'all transactions' under the agreement, also applies to Honeywell's tort claims. . . . Honeywell's tort claims rely on contract interpretation, and thus, New York law applies pursuant to the parties' contract."); *House v. IRS*, 2008 WL 11448019, *5 (D. Ariz. 2008) ("Claims arising in tort are not ordinarily controlled by a contractual choice of law provision. Rather, they are decided according to the law of the forum state. However, Arizona courts recognize that it may be appropriate to apply a contractual choice of law provision to tort claims under certain circumstances. Whether a choice of law provision applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract. . . . Because the resolution of Plaintiff's claims for negligence and breach of fiduciary duty depend on interpretation of the parties' contract, the Court will apply the choice of law provision to the claims for negligence and breach of fiduciary duty. . . . [T]he resolution of Plaintiff's claims for fraud, deceit, and misrepresentation [also] depend on interpretation of the parties' contract. The Court will also apply the choice of law provision to these claims.") (cleaned up). *See also U.S. Aviation Underwriters, Inc. v. Eurocopter*, 2006 WL 1882709, *1 n.2 (D. Ariz. 2006) ("Although contractual choice of law provisions do not ordinarily control the choice of law analysis for tort claims, when contractual interpretation is necessary to resolve the claim, the choice of law provision may also apply to tort claims.") (citing *Winsor*, 63 P.3d at 1043).

For this reason, Plaintiff is mistaken in its contention (Doc. 22 at 4) that the Court should proceed directly to the "most significant relationship" test set forth at § 145 of the

Restatement (Second) of Conflict of Laws when deciding which state's law to apply here. Although that test is, in general, the applicable test in Arizona "to determine the controlling law for multistate torts," *Bates v. Sup. Ct. of Ariz.*, 749 P.2d 1367, 1369-70 (Ariz. 1988), the authorities cited above indicate that Arizona courts should consider that test only if the parties' contractual choice-of-law provision has been deemed inapplicable. *Winsor*, 63 P.3d at 1044 ("*Without an applicable choice of law provision*, Arizona courts follow [§ 145(1) of] the Restatement (Second) of Conflict of Laws (1971) . . . to determine the controlling law.") (emphasis added).

Here, Plaintiff's tort claims in Counts One and Two will necessarily require interpretation of the Software Agreement. The allegations underlying those claims all relate to alleged pre-contractual misrepresentations made by Defendant regarding the nature and capabilities of the Software that is the subject of the Software Agreement. Indeed, in Count One, Plaintiff refers to these misrepresentations "as a *precondition of the [Software] Agreement*." (Doc. 14 ¶ 51 [emphasis added].) And in Count Two, Plaintiff alleges that Defendant "negligently provided [Plaintiff] with false, incorrect, inaccurate, and/or incomplete information, and/or omitted information *regarding the subject matter of the [Software] Agreement*." (*Id.* ¶ 62 [emphasis added].) Accordingly, Plaintiff's claims in Counts One and Two are governed by Michigan law. *Winsor*, 63 P.3d at 1043-44; *Honeywell Int'l Inc.*, 2019 WL 5960063 at *2; *House*, 2008 WL 11448019 at *5.[5]

### 3. Michigan's ELR

When evaluating whether Michigan's version of the ELR bars Counts One and Two,

---

[5]    The Court notes that this outcome is consistent with § 201 of the Restatement (Second) of Conflict of Laws. Comment a to § 201 explains that "questions involving the effect of misrepresentations, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice. Otherwise, these questions are determined by the law selected by application of the rule of § 188." *Id.* (citation omitted). Meanwhile, comment c explains that "[t]he fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily mean that a choice-of-law provision contained therein will be denied effect. This will only be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision. Otherwise, the choice-of-law provision will be given effect provided that it meets the requirements of § 187." *Id.* (citation omitted). Here, Plaintiff does not argue that the choice-of-law provision in the Software Agreement itself is invalid or was obtained through fraud.

the Court must "approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (citation omitted). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Id.* (citation omitted).

In its analysis of the ELR under Michigan law,[6] Defendant focuses on *TIBCO Software, Inc. v. Gordon Food Serv., Inc.*, 2003 WL 21683850 (W.D. Mich. 2003), as the most analogous precedent. (Doc. 17 at 14-15.) Defendant argues that where, as here, "the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." (*Id.*, quoting *TIBCO Software*, 2003 WL 21683850 at *4.)

In response, Plaintiff cites *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541 (Mich. Ct. App. 1995), in support of the argument that "Michigan . . . recognizes a fraud-in-the-inducement exception to the" ELR. (Doc. 22 at 11-12 n.6.)

In reply, Defendant argues *Huron Tool* is distinguishable because it only recognizes an exception for "allegations of fraud 'extraneous to the contract' and not 'fraud interwoven with the breach of contract.'" (Doc. 25 at 10.) Defendant concludes that under Michigan's version of the ELR (which is more properly termed the "separate and distinct" doctrine for cases not governed by the UCC),[7] Plaintiff's fraudulent inducement claim is barred. (*Id.* at 10-11 & 11 n.9.)

The ELR "has firm roots in Michigan jurisprudence." *Huron Tool*, 532 N.W.2d at 543. Under Michigan law, the ELR "provides that '[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is

---

[6]    Although the parties' briefs also contain an extensive discussion of the scope of the ELR under Arizona law, it is unnecessary to summarize that discussion here in light of the determination that Michigan law applies.

[7]    Although the separate-but-distinct and ELR doctrines appear to be similar, neither party argues that the separate-but-distinct doctrine, rather than the ELR, should apply in this case. Because "the sale or lease of software is typically treated as a sale of goods governed by the Uniform Commercial Code, even though the agreement contains some service elements," *TIBCO Software*, 2003 WL 21683850 at *5, the Court need not address the separate-but-distinct doctrine under these facts.

said to be in contract alone, for he has suffered only "economic" losses.'" *Id.* (quoting *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 615 (Mich. 1992)).

Under Michigan's ELR, fraud in the inducement is "generally . . . distinguished . . . as the only kind of fraud claim not barred by the [ELR]." *Id.* at 544. "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the [ELR]—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Id.* at 545. In other words, under Michigan law, fraud in the inducement is considered an exception to the ELR.

There is, however, an exception to that exception—"where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." *Id.* "The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction . . . between fraud extraneous to the contract and fraud interwoven with the breach of contract." *Id.* "[W]here fraud and breach of contract claims are factually indistinguishable," there exists "[t]he danger of allowing contract law to drown in a sea of tort." *Id.* at 546 (internal quotations and citations omitted).

In *Huron Tool*, the Michigan Court of Appeals held that the plaintiff's fraud claim was barred by the ELR because "[t]he fraudulent representations alleged by plaintiff concern the quality and characteristics of the software system sold by defendants." *Id.* Because the representations alleged by the plaintiff were "indistinguishable from the terms of the contract and warranty that plaintiff alleges were breached," and because the plaintiff "fail[ed] to allege any wrongdoing by defendants independent of defendants' breach of contract and warranty," the court found that "plaintiff's allegations of fraud [were] not extraneous to the contractual dispute" and thus "dismissal of plaintiff's fraud claim was proper." *Id.*

Similarly, in *General Motors Corp. v. Alumni-Bunk, Inc.*, 757 N.W.2d 859 (Mem.) (Mich. 2008), the Michigan Supreme Court reversed in part the judgment of the appeals

court and held that "[t]he trial court did not err in granting the defendants' motion for summary disposition on the plaintiff's claim of fraudulent inducement," "for the reasons stated in the Court of Appeals dissenting opinion." *Id.*  The underlying dissent addressed whether the ELR should bar a claim for fraudulent inducement where the plaintiff alleged that the defendant agreed, but failed, to "upfit" vehicles before reselling them, and where "this 'term' or 'representation' was not included in the" agreement between the parties. *Gen. Motors Corp. v. Alumi-Bunk, Inc.*, 2007 WL 2118796, *7-11 (Mich. Ct. App. 2007) (unpub.) (Kelly, J., dissenting).  Because "[t]he alleged misrepresentations that form[ed] the basis of [the] fraud claim [we]re precisely the same as those alleged in [the] breach of contract claim," the fraud claim was "not viable."  *Id.* at *10.  The dissenting opinion proceeded to outline how the allegations underlying the plaintiff's fraud, negligent, innocent, and/or intentional misrepresentation, and breach of express/implied contract claims were all the same—*i.e.*, a failure to upfit.  *Id.*

Here, Plaintiff's claims for fraud/fraudulent inducement and negligent misrepresentation concern the quality or character of the Software that is the subject of the Software Agreement.  Counts One and Two are each premised on alleged misrepresentations regarding the Software's "capabilities," "functionality," and "nature." (Doc. 14 ¶¶ 48-50, 53-54, 63-65.)  Indeed, in Count Two, Plaintiff alleges that Defendant "negligently provided [it] with false, incorrect, inaccurate, and/or incomplete information, and/or omitted information *regarding the subject matter of the [Software] Agreement.*" (*Id.* ¶ 62, emphasis added.)  And Plaintiff's allegations regarding the misrepresentations made by Defendant form the basis of both its fraud and breach of contract claims. Accordingly, under *Huron Tool* and *General Motors*, Counts One and Two are—at least to the extent they seek damages—barred by the ELR.  *See also Irwin Seating Co. v. Int'l Bus. Machines Corp.*, 306 F. App'x 239, 243 (6th Cir. 2009) ("But the *Huron Tool* court made clear that there is an exception to this exception, i.e., the [ELR] does apply to claims for fraudulent inducement if the allegedly fraudulent misrepresentations relate solely to the 'quality or character of the goods sold.'") (quoting *Huron Tool*, 532 N.W.2d at 545);

*Martin v. A.O. Smith Corp.*, 931 F. Supp. 543, 547 (W.D. Mich. 1996) ("The exception applies only where the alleged misrepresentations do not concern the quality or character of the goods that are the subject of the parties' contractual agreement.  Here, all of the alleged misrepresentations concern the quality or character of the Harvestore silos and could freely have been made part of the parties' contract negotiations.  The present allegations do not make out claims for fraud in the inducement as the term is defined in *Huron Tool.*") (citations omitted); *Valleyside Dairy Farms, Inc. v. A.O. Smith Corp.*, 944 F. Supp. 612, 617 (W.D. Mich. 1995) ("[P]laintiffs' claim does not come within the *Huron Tool* exception for fraud in the inducement.  The allegedly fraudulent representations that induced the plaintiffs to use Harvestore silos 'concern the quality and characteristics' of the Harvestore silos . . . .  Plaintiffs' fraud claims are inextricably connected to the 'quality or character' of the silos about which plaintiffs could have negotiated a warranty and other terms to account for possible defects in the goods or nonperformance. . . .  Further, plaintiffs' allegations are essentially indistinguishable from a contract claim that they could have brought against their seller, had they negotiated a warranty of quality and performance.  Accordingly, the [ELR] applies and bars plaintiffs' fraud claims.").

*TIBCO Software* is also instructive.  There, Gordon, a software licensee, alleged that during pre-contractual discussions, "someone at TIBCO assured Gordon" that the software that was the subject of the parties' licensing agreement "would function as a file transfer protocol server ('FTP Server')."  2003 WL 21683850 at *1.  However, the parties' licensing agreement "d[id] not mention FTP Servers."  *Id.*  Because the software ended up not having that functionality, Gordon brought counterclaims for, among other things, silent fraud and misrepresentation "based on TIBCO's alleged failure to disclose that the [s]oftware would not function properly without a third-party FTP server."  *Id.* at *3.  The *TIBCO Software* court concluded that those claims were barred by Michigan's version of the ELR:

> Gordon's fraud claims are based on the character of the [s]oftware.  Gordon alleges that TIBCO said that it would provide [s]oftware that would perform certain functions that Gordon desired.  According to Gordon, the [s]oftware

that TIBCO delivered could not perform these functions.  Thus, the essence of Gordon's breach of contract claim, as well as its fraud claims, is that the [s]oftware lacked the character for which Gordon bargained.  Gordon's fraud claims, therefore, are interwoven with the breach of contract rather than extraneous to the contractual dispute.  Accordingly, Counts I and II of Gordon's Counterclaim are barred by the [ELR] and will be dismissed.

*Id.* at *5.  The facts of *TIBCO Software* are virtually indistinguishable from those here.  As in *TIBCO Software*, Plaintiff alleges that Defendant made certain pre-contractual representations about the Software; the Software Agreement does not expressly mention (and in many instances, directly contradicts) those representations; and Plaintiff now alleges that those representations constitute fraud.  Per *TIBCO Software*, such fraud claims are—at least to the extent they seek damages—barred by the ELR.

Plaintiff's response brief does not discuss or seek to distinguish *TIBCO Software*.  Instead, in a footnote, Plaintiff merely cites *Huron Tool* for the proposition that Michigan "recognizes a fraud-in-the-inducement exception to the [ELR]."  (Doc. 22 at 11-12 n.6.)  But Plaintiff makes no attempt to explain why or how its tort claims do *not* concern the "quality and character" of the Software that is the subject of the Software Agreement.  In other words, Plaintiff fails to address why its claims do not fall under *Huron Tool*'s exception-to-the-exception.

### 4.   Rescission

This conclusion does not end the analysis, because Plaintiff argues in the alternative that the ELR "is inapplicable to [its] fraudulent inducement and negligent misrepresentation claims, because [it] is seeking the remedy of rescission through these claims."  (Doc. 22 at 12.)

At least on this record and at this early stage of the case, the Court agrees with Plaintiff that Counts One and Two are not subject to dismissal based on the ELR.  As an initial matter, Defendant makes no effort to respond to this specific argument in its reply brief.  "All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists."  *Cohen v. Bd. of Trs. of Univ. of D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (citation omitted).  It is difficult to see how Defendant

1    could be deemed to have met that burden given its silence on the rescission issue.

2           In any event, the Court's independent research has uncovered authority that seems

3    to support Plaintiff's position.  As background, "[a] fraudulent inducement claim generally

4    requires an election of remedies: either affirm the contract, retain the benefits, and seek

5    damages, or rescind the contract, return the benefits, and seek restitution (reimbursement

6    for expenses incurred as a result of the fraud)."  *Kochert v. Adagen Med. Int'l, Inc.*, 491

7    F.3d 674, 676 (7th Cir. 2007).  *See also Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534

8    N.W.2d 217, 219 (Mich. Ct. App. 1995) ("Michigan also recognizes fraud in the

9    inducement . . . [which] renders the contract voidable at the option of the defrauded

10   party."); *Matsuura v. Alston & Bird*, 166 F.3d 1006, 1008 (9th Cir. 1999), *opinion amended*

11   *on denial of reh'g*, 179 F.3d 1131 (9th Cir. 1999) ("Under Delaware law, parties who have

12   been fraudulently induced to enter into a contract have a choice of remedies: they may

13   rescind the contract or they may affirm the contract and sue for fraud.") (footnote omitted).

14   Here, Plaintiff has elected to pursue rescission and restitution (rather than damages) as a

15   remedy with respect to Counts One and Two.  (Doc. 14 ¶¶ 57, 70.)[8]

16          Many courts have held that when, as here, a plaintiff asserting a fraudulent

17   inducement claim elects to pursue the remedies of rescission and restitution, such a claim

18   should not be precluded by the ELR.  *See, e.g.*, *Biszantz v. Stephens Thoroughbreds*, 620

19   F. App'x 535, 542 (6th Cir. 2015) ("[W]e doubt that Kentucky would employ the [ELR]

20   to bar fraud claims seeking rescission.");[9]  *Harley-Davidson Motor Co., Inc. v.*

21   *PowerSports, Inc.*, 319 F.3d 973, 985 (7th Cir. 2003) ("[T]he rationale behind Wisconsin's

22   [ELR] does not support a rule barring misrepresentation claims for rescission."); *Int'l*

23   *Franchise Sols. LLC v. BizCard Xpress LLC*, 2013 WL 2152549, *3 (D. Ariz. 2013) ("The

---

[8]        Although the above-cited authorities address how the election of remedies operates in the context of a fraudulent inducement claim, Plaintiff seems to contend (and Defendant does not appear to dispute) that the same principles apply in the context of Plaintiff's negligent misrepresentation claim.  For present purposes, the Court assumes without deciding that this is correct.

[9]        It should be noted that more than a decade before *Biszantz* was decided, a federal district court in Kentucky reached the opposite conclusion when formulating a prediction as to how the Kentucky Supreme Court would decide this issue.  *Highland Stud Int'l v. Baffert*, 2002 WL 34403141, *6 n.9 (E.D. Ky. 2002).

Arizona Court of Appeals has held that the [ELR] can bar fraud in the inducement claims, but not if such claims seek to rescind or reform the contract induced by fraud. Because the amended counterclaim requests the remedy of rescission, the [ELR] may not bar BizCard's claim.") (citation omitted); *TigerDirect, Inc. v. Manhattan Assocs., Inc.*, 2006 WL 8430268, *3 (S.D. Fla. 2006) ("In light of the rationale of the [ELR] and the effect of rescission, the application of the [ELR] to a claim of rescission is particularly nonsensical, as rescission completely bypasses the terms of the contract, regardless of how carefully drafted and negotiated they are, to place the parties in the position they were in before they entered into the contract. And, despite Defendant's statements to the contrary, Florida law supports this result.").

Those authorities, to be clear, are not binding here—the critical question is whether the Michigan Supreme Court would adopt the same rule. *Ticknor*, 265 F.3d at 939 ("Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it.") (citation omitted). In the Court's view, the answer is likely yes, given the seemingly broad consensus in other jurisdictions that the ELR does not apply in this circumstance. *In re Kirkland*, 915 F.2d 1236, 1238-39 (9th Cir. 1990) ("When interpreting state law, a federal court is bound by the decision of the highest state court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, *decisions from other jurisdictions*, statutes, treatises, and restatements as guidance.") (emphasis added, citation omitted).

This prediction is not free from doubt. At least one federal court in Michigan has reached (at least implicitly) the opposite prediction on this issue, albeit without delving too deeply into the issue. *Merchants Publ'g Co. v. Maruka Machinery Corp. of Am.*, 800 F. Supp. 1490, 1493 (W.D. Mich. 1992) (concluding that the plaintiff's claims for "fraud and misrepresentation," "innocent and negligent misrepresentation," and "rescission of contract" were all barred by the separate-but-distinct doctrine, without addressing whether the rescission claim required separate analysis). Additionally, although the decision in

- 22 -

1   *TIBCO Software* does not discuss whether the counterclaimant had elected to pursue the

2   remedy of rescission based on the counterclaim for fraudulent misrepresentation, a review

3   of the docket in that case reveals that the counterclaimant was seeking both rescission and

4   damages.  (Answer, Affirmative Defenses, Counterclaim and Jury Demand at 8, 9, *TIBCO*

5   *Software, Inc. v. Gordon Food Serv., Inc.*, 2003 WL 21683850 (W.D. Mich. 2003) (No.

6   03-cv-00025) ["WHEREFORE, Gordon requests that this Court: (a) Rescind the Software

7   Agreement and Work Order and any other related agreements entered into between Gordon

8   and Tibco and (b) Grant to Gordon any other relief which this Court deems is just and

9   proper, including an award of damages, interest, costs and attorney fees."].)  Thus, it is

10  possible to view *TIBCO Software* as also implicitly reaching the opposite prediction.[10]

11          Even so, the Court must be guided by the principle that "[f]ederal courts are not free

12  to expand the existing scope of state law without clear guidance from the state's highest

13  court."  *Van Go LLC v. Potts*, 2016 WL 4974968, *4 (D. Ariz. 2016).  Where multiple

14  other jurisdictions seem to decline to apply the ELR in this circumstance, the Michigan

15  Supreme Court has never clearly stated that it would deviate from that approach, and

16  Defendant has not even briefed the issue, Defendant has failed to meet its burden of

17  showing that Counts One and Two are subject to dismissal based on the ELR.

18          C.     **Parol Evidence And Reasonable Reliance**

19                 1.     <u>The Parties' Arguments</u>

20          Defendant's final argument is that Counts One and Two should be dismissed

21  because "[u]nder Arizona law, the parol evidence rule precludes [Plaintiff] from relying on

---

22  [10]        In contrast, it does not appear that the plaintiffs in the remaining Michigan ELR

23  authorities discussed in Part II.B.3 elected to pursue rescission rather than damages. *Huron Tool*, 532 N.W.2d at 543 (no mention of any request for rescission); *Gen. Motors Corp.*,

24  2007 WL 2118796 at *1-2 (noting that the defendant sought dismissal of the plaintiff's "claim for lost profits" and not mentioning any alternative claim for rescission); *Irwin*

25  *Seating Co.*, 306 F. App'x at 240 ("Irwin filed a complaint seeking damages from the three technology companies based upon various contract, warranty, tort, and statutory claims.");

26  *Valleyside Dairy Farms, Inc.*, 944 F. Supp. at 617 (noting that the "plaintiffs claim[ed] non-economic loss for humiliation, outrage, indignity, emotional distress and mental

27  anguish" and not mentioning any alternative claim for rescission); *Martin*, 931 F. Supp. at 546 ("Plaintiffs undisputedly seek recovery of economic loss caused by defective silos

28  purchased or leased for commercial purposes.").  Thus, those authorities do not undermine the prediction being offered here.

pre-contractual representations to vary or contradict the terms of a written agreement." (Doc. 17 at 16.)  Defendant emphasizes that § 11(c) of the Software "Agreement contains express representations that [Plaintiff]: (1) did not rely on any extra-contractual representations; (2) assumed sole responsibility to ensure the Software met [Plaintiff's] particular purposes; and (3) accepted the Software 'as is'" and that "[e]vidence of pre-contractual statements to vary those terms are not admissible." (*Id.*)  Defendant further argues that "[u]nder Michigan law, this [same] contractual language prevents a showing of reasonable reliance on pre-contractual statements necessary to support a fraud claim." (*Id.* at 16-17.)

In response, Plaintiff does not address these arguments directly but argues that the Software Agreement's "integration clause" does not "automatically foreclose[]" its fraudulent inducement claim.  (Doc. 22 at 8-9.)  Plaintiff argues that, under Arizona law, "a party cannot free himself from fraud by incorporating an integration clause in a contract." (*Id.* at 8, citation omitted).  Similarly, Plaintiff argues that "under Michigan law, the presence of a merger or integration clause does not defeat a fraudulent inducement claim." (*Id.* at 9 n.3.)

## 2.  Analysis

As stated in Part II.B.2, Counts One and Two are governed by Michigan law.  As for Count One, "[t]o prevail on a theory of fraud in the inducement, a plaintiff must prove five essential elements, one of which is reasonable (or justified) reliance." *Smith Living Tr. v. Erickson Ret. Communities*, 928 N.W.2d 227, 240 (Mich. Ct. App. 2018).  Likewise, as for Count Two, "[a] misrepresentation claim requires reasonable reliance on a false representation." *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235, 238 (Mich. Ct. App. 1994).

Although the parties appear to frame the issue as whether a merger (or integration) clause in a contract prevents a plaintiff's reasonable reliance on pre-contractual statements made by a defendant (*see, e.g.*, Doc. 17 at 16-17; Doc. 22 at 9 n.3), the Software Agreement's "Entire Agreement," or merger/integration clause, is found at § 28.  Defendant does not specifically cite that clause in support of its arguments and instead

1    points to § 11(c).  Accordingly, the Court construes Defendant's dismissal argument as that

2    § 28 and § 11(c) together preclude a showing of reasonable reliance by Plaintiff.

3                    a.        **Section 28 (The Merger/Integration Clause)**

4            As noted, § 28 is an "Entire Agreement" clause (sometimes called a "merger" or

5    "integration" clause), which states: "This [Software] Agreement, together with any

6    Exhibits, Attachments, Schedules, and Statements of Work, shall constitute the entire

7    [Software] Agreement between the Parties.  This [Software] Agreement supersedes all

8    prior oral and written communications, agreements, and understandings of the Parties with

9    respect to the subject of this [Software] Agreement."  (Doc. 17-1 at 17.)[11]

10           "Under Michigan law, a merger clause (sometimes called an 'integration clause')

11   can preclude a fraud claim in two related ways.  First, by establishing that a written contract

12   is an integrated agreement, a merger clause brings into play the parol evidence rule, which

13   prohibits evidence of oral promises made prior to or contemporaneous with the execution

14   of a written agreement.  Second, since a merger clause nullifies a promise not included in

15   the written agreement, it also makes reliance on that promise unreasonable.  Reasonable

16   reliance is one element of a fraud claim under Michigan law."  *Whitesell Corp. v. Whirlpool*

17   *Corp.*, 2009 WL 3270265, *3 (W.D. Mich. 2009) (citations omitted).

18           In Michigan, "[p]arol evidence is generally admissible to demonstrate fraud."

19   *UAW-GM Hum. Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 418 (Mich. Ct. App.

20   1998).  "However, in the context of an integration clause, which releases all antecedent

21   claims, only certain types of fraud would vitiate the contract."  *Id.* at 419.  "[W]hile parol

22   evidence is generally admissible to prove fraud, fraud that relates solely to an oral

23   agreement that was nullified by a valid merger clause would have no effect on the validity

24   of the contract.  Thus, when a contract contains a valid merger clause, the only fraud that

25   could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud

26   ───────────────

27   [11]    Similar language appears in the first paragraph of the Software Agreement: "The
     foregoing documents make up the entire contract between [Defendant] and [Plaintiff].  No
28   other terms and conditions shall be binding upon [Defendant], except to the extent
     [Defendant] expressly accepts such terms and conditions in writing by an authorized
     [Defendant] representative."  (Doc. 17-1 at 7.)

1    relating to the merger clause or fraud that invalidates the entire contract including the

2    merger clause." *Id.* Here, there are no allegations that the merger clause itself was obtained

3    via fraud. Thus, the only question is whether the pre-contractual representations alleged in

4    the FAC would vitiate the entire contract (including the merger clause).

5        Defendant cites *Hamade v. Sunoco Inc. (R&M)*, 721 N.W.2d 233 (Mich. Ct. App.

6    2006), in support of its argument that the language in the Software Agreement "prevents a

7    showing of reasonable reliance on pre-contractual statements necessary to support a fraud

8    claim" because a "valid integration clause renders reliance on the representation

9    unreasonable as a matter of law." (Doc. 17 at 16-17, quoting *Hamade*, 721 N.W.2d at 250.)

10   In *Hamade*, the plaintiff brought breach of contract and fraud claims against Sunoco,

11   arguing that Sunoco "permitted another Sunoco station to open down the road from

12   Hamade's station" and that "Sunoco induced Hamade to enter into the 1997 Agreement by

13   promising him that it would not allow another Sunoco station to open within three to five

14   miles of Hamade's station on the same line of traffic." 721 N.W.2d at 247. Citing *UAW-

15   GM*, the court held that the "[p]laintiff failed to demonstrate fraud that would invalidate

16   the integration clause or otherwise invalidate the entire contract," and "because the valid

17   integration clause nullified all prior and contemporaneous agreements, understandings,

18   representations, and warranties, plaintiff may not use parol evidence to contradict the

19   explicit terms of the integration clause" and "the valid integration clause renders reliance

20   on the representation unreasonable as a matter of law." *Id.* at 250.

21       But *Hamade* is distinguishable. In *Jenson v. Gallagher*, 2014 WL 667790 (Mich.

22   Ct. App. 2014), cited by Plaintiff (Doc. 22 at 9 n.3), the Michigan Court of Appeals held

23   that the plaintiffs had "allege[d] a fraud that would invalidate the contract" where they

24   alleged that the defendant had fraudulently induced them into signing a contract to purchase

25   a house by misrepresenting that the house was beachfront property. 2014 WL 667790 at

26   *3. Distinguishing *Hamade*, the *Jenson* court emphasized that the misrepresentation "did

27   not concern the need for a particular clause in the contract. Rather it went directly to

28   plaintiffs' desire in purchasing the property at all. That is, it fraudulently induced them to

sign the contract." *Id.*   Here, similarly, Plaintiff's allegations are that Defendant's misrepresentations about the nature of the Software induced Plaintiff to execute the contract—*not* that Plaintiff was led to believe a clause in the contract was unnecessary because Defendant agreed to do (or not do) something in the future.  Thus, this case is more like *Jensen* than *Hamade*.

The *Jensen* court then discussed at length several Michigan cases addressing fraud, merger clauses, and reasonable reliance.  The *Jensen* court "note[d] that fraud in the inducement to sign a contract will vitiate the contract despite an integration clause" and that "parol evidence may be introduced to establish the fraud in the inducement despite an integration clause." *Id.* at *4.  Quoting from *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927 (E.D. Mich. 2005), the court stated:

> There is an important distinction between (a) representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract.  It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation.   It stretches the *UAW-GM* ruling too far to say that any pre-contractual factual misrepresentations made by a party to a contract are wiped away by simply including a merger clause in the final contract.  Such a holding would provide protection for disreputable parties who knowingly submit false accountings, doctored credentials and/or already encumbered properties as security to unknowing parties so long as they were savvy enough to include a merger clause in their contracts.
>
> . . .
>
> In sum, the *UAW-GM* court did not bar a fraud claim in all cases in which the underlying contract has a merger clause, the court simply held that in that case the "plaintiff made no allegations of fraud that would invalidate the contract or the merger clause."
>
> . . .
>
> The key element in cases involving a merger clause is whether one justifiably relied on the representations of another when the parties' written agreement clearly stated by signing the document they were agreeing that the document made up the parties' entire agreement regarding the terms of the contract and its performance standards.  The Michigan courts have said that, as it pertains to representations regarding additional agreements or contractual terms, a

party would not be justified in relying on them where there is a merger clause. The reasoning behind this is clear, one should not be heard to complain that they relied on oral promises regarding additional or contrary contract terms when there is written proof, signed by both parties, to the contrary. Yet, a party could still justifiably rely upon representations made by another party regarding things outside the scope of the contractual terms, such as the other party's solvency, indebtedness, experience, clientele, client retention rate, business structure, etc. If these representations are false when they are made, not merely opinion and not future promises, they could constitute fraud in the inducement.

*Id.* at *4-5 (citations omitted).

As in *Jensen*, Plaintiff alleges it was "fraudulently induced to enter into the contract in the first place because it was falsely represented to [Plaintiff] that what [it] w[as] buying was" Software with certain functionalities. *Id.* at *5. As in *Jensen*, "the situation is that it is alleged that [Defendant] misrepresented what was being sold in order to induce [P]laintiff[] to enter into the [Software] [A]greement in the first place." *Id.* Thus, per *Jensen*, Plaintiff's tort claims are not barred solely by § 28 of the Software Agreement.

*Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760 (E.D. Mich. 2014), cited by Plaintiff (Doc. 22 at 9 n.3), also supports that the presence of an integration clause in the Software Agreement does not, alone, necessarily defeat Plaintiff's tort claims. In *Llewellyn-Jones*, "[t]he complaint allege[d] that the defendants made multiple material representations to the plaintiffs to induce them to purchase the Detroit properties, *i.e.*, that the properties were currently tenanted, the tenants were paying a specific amount of monthly rent on executed, valid leases, the homes were Section 8 approved, the properties were newly and fully refurbished, and the properties would generate a specific amount of income and percentage rate of return on initial investment"—but "these representations were false." *Id.* at 779. The plaintiffs brought several fraud claims, prompting the defendants to "argue that the plaintiffs cannot plausibly allege the element of reasonable reliance because the contract contains a merger clause and declares that the properties were sold in 'As Is Condition.'" *Id.* at 784. The court held that "the presence of a merger clause in a written contract will not preclude a claim for fraud in the inducement where the

plaintiff can show that it would have avoided the agreement entirely had it known that the defendant's fraudulent representations in fact were false." *Id.* Because the plaintiffs "contend[ed] that the defendants' misrepresentations induced them to enter into the purchase agreements for the Detroit properties" and argued "that they would not have entered into those agreements but for the misrepresentations about the properties," those allegations, "if true, would invalidate the entire contract, including the merger clauses." *Id.* at 785. The court thus held that "[t]he merger clause and clause that renders the properties sold in 'As in Condition' . . . do not render the plaintiffs' reliance on prior representations unreasonable as a matter of law." *Id.*

The misrepresentations about the properties in *Llewellyn-Jones* are similar to the alleged misrepresentations about the Software, as each case involves an allegation that the subject of the parties' contract was falsely portrayed as possessing certain characteristics. What's more, as in *Llewellyn-Jones*, the FAC alleges that Plaintiff "would not have entered the [Software] Agreement had it known" that Defendant's representations about the Software's functionality "were false" (Doc. 14 ¶ 55); that Plaintiff "would not have entered the [Software] Agreement had it known the material information [Defendant] intentionally withheld" (*id.* ¶ 56); and that the information "withheld" by Defendant "was material to [Plaintiff's] decision to enter into the [Software] Agreement" (*id.* ¶ 65). In Count Three (Declaratory Judgment), Plaintiff also alleges that the parties "have an active controversy over whether the [Software] Agreement is enforceable." (*Id.* ¶ 73.) Per *Llewellyn-Jones*, these allegations mean that § 28 of the Software Agreement does not, alone, foreclose Plaintiff's tort claims. *See also Diamond Computer Sys., Inc. v. SBC Commc'ns, Inc.*, 424 F. Supp. 2d 970, 985 (E.D. Mich. 2006) ("In this case, the plaintiff contends that the defendant's misrepresentations induced it to enter into all of the contracts to provide Internet services on a wholesale basis so that it could embark on its business venture of providing those services to retail customers in the Saginaw region. To the extent that the plaintiff maintains that it would not have entered into those agreements but for the misrepresentations concerning exclusivity and quick and easy connectivity, the plaintiff

alleges fraud that would invalidate the entire contracts, including the merger clauses.").

b.    **Section 11(c)**

Defendant's dismissal arguments do not rest solely on the merger/integration clause that appears at § 28 of the Software Agreement.  Defendant also relies on—and, indeed, places the most emphasis on—§ 11(c) of the Software Agreement, which provides as follows:

> **Disclaimers**.  The warranties expressly stated in this Section 11 are the sole and exclusive warranties offered by [Defendant].  There are no other warranties or conditions, express or implied by [Defendant] or its licensors, including without limitation, those of merchantability, fitness for a particular purpose, non-infringement, or achievement of deal sheet and time sheet values, (which are only estimates of profits and payouts).  [Plaintiff] acknowledges that . . . except as expressly stated herein, the Service and the Software are provided to [Plaintiff] on an "as is" and "as available" basis, and are for [Plaintiff's] internal commercial use only . . . .  [Plaintiff] assumes all responsibility for determining whether the Service or the information generated thereby is accurate or sufficient for [Plaintiff's] purposes. . . . [Plaintiff] represents that it is not relying on any representation of [Defendant] that is not expressly stated in this [Software] Agreement, and that [Plaintiff] accepts sole and complete responsibility for: (i) the selection of the Software to achieve [Plaintiff's] intended results; (ii) use of the Software; (iii) the results obtained from the Software; and (iv) performance of any contract between [Plaintiff] and any third party.

(Doc. 17-1 at 13.)

For purposes of analytical clarity, the Court will separate the disclaimers in this section into two different categories: (1) the no-reliance clause appearing in the final sentence; and (2) the various disclaimers regarding specific features of the Software.

i.    <u>The No-Reliance Clause</u>

The final sentence of § 11(c) begins with the clause: "[Plaintiff] represents that it is not relying on any representation of [Defendant] that is not expressly stated in this [Software] Agreement . . . ."  This language is sometimes known as a no-reliance clause.

"Like a merger clause, a no-reliance clause can abrogate the reliance element of a plaintiff's fraud claim.  However, while a merger clause purports to make reliance on

statements unreasonable indirectly by first making them inadmissible under the parol evidence rule, a no-reliance clause directly and explicitly makes reliance on statements unreasonable.  For this reason, no-reliance clauses have an altogether different effect than merger clauses on the reasonableness of reliance, and they therefore require a different analysis." *Whitesell*, 2009 WL 3270265 at *4.  The Seventh Circuit has explained that "the majority rule" across states "is that an integration clause does not bar a fraud claim"; however, "[o]ne consequence of th[is] rule is that parties to contracts who do want to head off the possibility of a fraud suit will sometimes insert a 'no-reliance' clause into their contract, stating that neither party has relied on any representations made by the other. Since reliance is an element of fraud, the clause, if upheld—and why should it not be upheld, at least when the contract is between sophisticated commercial enterprises—precludes a fraud suit . . . ." *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644-45 (7th Cir. 2002) (citations omitted).  *See also FMC Techs., Inc. v. Edwards*, 2007 WL 1725098, *4 (W.D. Wash. 2007), *aff'd*, 302 F. App'x 577 (9th Cir. 2008) ("It is undisputed that there is a significant difference between integration clauses and no-reliance clauses in contracts.").

Given these principles, Michigan courts have routinely rejected fraud claims premised on alleged extra-contractual representations due to the presence of a no-reliance clause in the parties' contract. *See, e.g.*, *Gifford v. Radecki*, 2022 WL 1699305, *4 (Mich. Ct. App. 2022) (affirming trial court's determination that the plaintiffs' "attempt to now claim reliance on prior statements of square footage . . . cannot succeed" because the contract included a no-reliance clause, which provided that "Buyer agrees that Buyer is not relying on any representation or statement made by Seller or any real estate salesperson (whether intentionally or negligently) regarding any aspect of the Property of this sale transaction, except as may be expressly set forth in this Agreement, a written amendment to this Agreement, or a disclosure statement separately signed by the Seller," and "as a matter of law any continued reliance despite this disclaimer would not be reasonable and could not support any claim for fraud or misrepresentation") (emphasis omitted); *HLI, LLC*

*v. Hayloft Dev. Co.*, 2021 WL 1478854, *5 (Mich. Ct. App. 2021) (holding that "the trial court properly dismissed plaintiffs' common-law fraud and silent fraud claims" where, *inter alia*, "under Section 6.9(b) of the purchase agreement, plaintiffs represented that they were not relying on any of defendants' representations"); *McKind v. Palms Invs., LLC*, 2007 WL 1342557, *3 (Mich. Ct. App. 2007) ("Plaintiff also expressly stated that that he was not relying on any information or representations provided or made by PI. Therefore, there is no genuine issue of material fact regarding the fifth element (reliance)."); *Federated Cap. Servs. v. Dextours, Inc.*, 2002 WL 868273, *1 (Mich. Ct. App. 2002) ("In any event, pursuant to the terms of the lease agreement, defendants expressly disclaimed reliance on any statements or representations made by plaintiff. By its plain terms, the agreement negates the reliance element necessary to prevail on a claim of fraud."). So have federal courts applying Michigan law. *See, e.g.*, *Langlois v. Terry Town Travel Ctr., Inc.*, 2021 WL 5053965, *6 (W.D. Mich. 2021) ("Plaintiffs next argue that Terry Town induced them to purchase the motorhome by misrepresentation and omission of material facts. . . . When a contract explicitly disclaims any reliance on statements or representations made by a defendant, that contract 'negates the reliance element necessary to prevail on a claim of fraud.' . . . Plaintiffs expressly agreed that they did not rely on anything outside the purchase agreement, which states only that the motorhome was sold 'used' and 'AS IS.' Therefore, the purchase agreement explicitly negates the reliance element, and Plaintiffs cannot establish a claim for fraud against Terry Town."); *Dolores v. Gen. R.V. Ctr., Inc.*, 398 F. Supp. 3d 184, 189-90 (E.D. Mich. 2019) ("To establish a claim for misrepresentation, Plaintiffs must demonstrate, among other elements, that they acted in reliance upon the misrepresentation. In the purchase agreement, however, Plaintiffs agreed that they did not rely upon any oral representations made by General RV. Accordingly, Plaintiffs cannot establish an essential element of their misrepresentation claims.") (citation omitted).

Although the above-cited authorities might seem, at first blush, to foreclose Counts One and Two, it is important to note that most of them were decided at summary judgment.

1   Here, in contrast, Defendant seeks dismissal at the pleading stage.  Moreover, the above-

2   cited authorities do not hold that the presence of a no-reliance clause *automatically* compels

3   the dismissal of the sort of fraudulent inducement and negligent misrepresentation claims

4   being asserted here.  In *Whitesell*, the district court conducted "[a] survey of persuasive

5   authority" from other jurisdictions, which  "reveal[ed] that courts generally look for three

6   factors to determine if a no[-]reliance clause will successfully abrogate the reliance element

7   of a fraud claim": (1) "courts are more willing to enforce a no-reliance clause if the

8   provision disclaiming reliance is its own separate clause rather than a provision embedded

9   within another clause of the agreement, such as a merger clause or an exculpatory clause";

10   (2) "courts are more willing to enforce a no-reliance clause if it expressly mentions and

11   disclaims 'reliance'"; and (3) "courts are more willing to enforce a no-reliance clause if the

12   contracting parties are sophisticated."  2009 WL 3270265 at *4.

13          Here, although the second factor identified in *Whitesell* favors Defendant (because

14   § 11(c) expressly mentions and disclaims reliance), the first and third factors do not, at

15   least at this stage of the case and in light of the standard of review applicable to a motion

16   to dismiss.  As for the first factor, the no-reliance language in § 11(c) is contained within a

17   lengthy paragraph, generically entitled "Disclaimers," that covers an array of different

18   topics. (Doc. 17-1 at 13.)  As for the third factor, the record is undeveloped as to whether

19   the contracting parties are sophisticated.  Although one might assume that Plaintiff is

20   sophisticated given the nature of its business and the dollar value of the contract, this is an

21   issue that requires factual development.  Given this backdrop, if the dismissal analysis were

22   limited to the integration/merger clause in § 28 and the no-reliance clause within § 11(c),

23   it is a very close call whether Counts One and Two would be subject to dismissal.  *Cf.*

24   *Cusano v. Gen. RV Ctr.*, 2019 WL 13193928, *5-6 & n.4 (E.D. Mich. 2019) (denying

25   motion to dismiss fraud claims where the defendant argued that the plaintiff "cannot

26   plausibly allege reasonable reliance on any pre-agreement representation" in light of the

27   "clause in the purchase agreement [that] disclaims reliance," concluding that "at this stage,

28   [the court] will not rule reliance unreasonable as a matter of law," but cautioning the

1    plaintiff that the analysis would be different "[o]n summary judgment").[12]

2                    ii.        The More Specific Disclaimers

3          The problem for Plaintiff is that the analysis is not limited to the integration/merger

4    clause in § 28 and the no-reliance clause within § 11(c).  In addition, § 11(c) includes

5    various disclaimers that directly address the Software's functionality and intended use.  For

6    example, although Plaintiff now alleges that it was defrauded and misled by Defendant's

7    pre-contractual representations concerning the Software's direct-to-customer billing

8    capabilities (*see, e.g.*, Doc. 14 ¶¶ 48, 63), the parties specifically agreed within § 11(c) that

9    the Software was for Plaintiff's "internal commercial use only" (Doc. 17-1 at 13).[13]

10   Similarly, although Plaintiff now alleges that it was defrauded and misled by Defendant's

11   pre-contractual representations concerning the Software's ability to "increase revenue for

12   [Plaintiff's] billing services" (Doc. 14 ¶ 48), the parties specifically agreed within § 11(c)

13   that Plaintiff "accepts sole and complete responsibility for . . . the results obtained from the

14   Software" (Doc. 17-1 at 13).  Plaintiff's remaining complaints regarding the Software's

15   functionality (and Defendant's alleged pre-contractual representations concerning the

16   Software's functionality) all derive, at least in some way, from the Software's inability to

17   meet Plaintiff's specific business needs (*see, e.g.*, Doc. 14 ¶¶ 52-53), but the parties agreed

18   in § 11(c) that Defendant was not making any warranties of "fitness for a particular

19   purpose" and that Plaintiff "accepts sole and complete responsibility for . . . the selection

20   of the Software to achieve [Plaintiff's] intended results" (Doc. 17-1 at 13).

21         Michigan courts, as well as courts applying Michigan law, have held that the

22   presence of these sorts of specific contractual disclaimers is enough to render a plaintiff's

23   ─────────────
     [12]      The Court notes that comment e to the Restatement (Third) of Torts: Liability for
24   Economic Harm § 11 provides a test for evaluating the effect of a no-reliance clause that
     is similar to, but slightly different than, the three-factor test identified in *Whitesell*.
25   Comment e explains: "The effect of a 'no-reliance' clause on a tort claim for fraud . . .
     depends on two considerations: the specificity of its wording and the sophistication of the
26   parties. . . .  Whether to give effect to a disclaimer of reliance is a question of law for the
     court unless it depends on factual disputes on which reasonable minds could differ."

27   [13]      Similar language appears at § 1 of the Software Agreement: "[Defendant] grants to
     [Plaintiff] and [Plaintiff] accepts from [Defendant], a limited, non-transferable, non-sub-
28   licensable, revocable subscription license to access and use [Defendant's] healthcare
     staffing software . . . solely for [Plaintiff's] internal business use."  (Doc. 17-1 at 9.)

reliance on alleged contradictory and fraudulent pre-contractual representations unreasonable as a matter of law—or, at the very least, is enough when the contract also (like the Software Agreement) contains a merger/integration clause.  For example, in *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546 (Mich. Ct. App. 1999), the plaintiff argued that he "raised viable claims of fraudulent and innocent misrepresentation regarding several statements defendants allegedly made in connection with hiring him.  He claim[ed] that defendants induced him into signing the written contract by fraudulently informing him that . . . (4) the at-will provision in the written contract did not apply to him, and (5) he would be allowed to sell insurance for companies other than Nationwide."  *Id.* at 552-53.  The trial court rejected those claims and the Michigan Court of Appeals affirmed, explaining that because "the written contract . . . expressly contradicted statements 4 and 5," the "plaintiff's reliance on statements 4 and 5 was not reasonable in light of the written contract," and "the statements, as a matter of law, did not support a misrepresentation claim."  *Id.* at 553-54.

Similarly, in *Doty v. Cleannet of Greater Mich., Inc.*, 2003 WL 22956401 (Mich. Ct. App. 2003), the plaintiffs purchased a commercial janitorial service after allegedly being "promise[d] by [the defendants] that plaintiffs would make thousands of dollars per month from guaranteed contracts, that CleanNet would train plaintiffs and would provide insurance coverage and that the contracts were guaranteed to last from ten to twenty years."  *Id.* at *1.  However, all of these "alleged misrepresentations were explained, contradicted or superseded by the written terms of the franchise agreements," which "contain[ed] specific clauses relating to the value and size of cleaning accounts, insurance, ownership of the business, designated territories, the term of the agreement, the termination, transfer and replacement of accounts, training, and selling the business."  *Id.* at *3.  Additionally, the franchise agreements contained "merger and integration clauses."  *Id*. at *4.  The Michigan Court of Appeals concluded that the presence of these contractual clauses rendered the plaintiffs' reliance on the earlier oral representations unreasonable as a matter of law: "Because the franchise agreements contain clauses that address the particular

1    statements allegedly made to induce plaintiffs to sign the agreements and because the

2    agreements contain clear merger and integrations clauses, defendants are correct—under

3    Michigan law, it was unreasonable for plaintiffs to rely on alleged outside representations."

4    *Id.*

5         And again, in *Safety Socket, LLC v. All State Fastener*, 2009 WL 1508377 (E.D.

6    Mich. 2009), the plaintiff (an industrial device manufacturer) entered into contract

7    negotiations with the defendant (an industrial device distributor). *Id.* at *1. During the

8    negotiations, the defendant allegedly represented that it was "the exclusive supplier of non-

9    fastener shaft-type parts" to Honeywell, such that Plaintiff would "by extension" become

10   Honeywell's exclusive supplier upon entering into the contract. *Id.* at *4. However, in the

11   parties' subsequently executed contract, there was no "mention [of] Honeywell or

12   exclusivity" and the contract included various other provisions that were inconsistent with

13   the notion of an exclusivity arrangement, such as a "provision for the non-solicitation of

14   Honeywell by Plaintiff," which "would be unnecessary" "if Honeywell had an exclusive

15   relationship with" the defendant. *Id.* at *11-13. At summary judgment, the defendant

16   argued that the plaintiff's fraud claims were barred by the ELR but the district court found

17   it unnecessary to resolve the applicability of the ELR because the fraud claims failed for a

18   different reason—because any claim of reasonable reliance on "the alleged representation

19   was nullified by the Merger clause and was further contradicted by other provisions of the

20   Terms and Conditions Agreement." *Id.* at *11. The court added: "If Plaintiff wanted to

21   rely on any representation regarding exclusivity, then it should have addressed its concerns

22   before signing an agreement, which contained a broad merger clause and a clause

23   disclaiming any and all volume projections." *Id.* at *13.

24        Here, too, because the Software Agreement contains not only a merger/integration

25   clause and a no-reliance clause but also additional provisions that expressly disclaim that

26   the Software will have the functionality allegedly promised during the parties' pre-

27   contractual representations, Plaintiff's alleged reliance on those promises was

28   unreasonable as a matter of Michigan law.

### D.    **Summary As To Counts One And Two**

Although Defendant is incorrect that Counts One and Two are subject to dismissal based on the ELR, those claims are subject to dismissal for two other reasons: first, Plaintiff has failed to comply with Rule 9(b); and second, the facts as pleaded establish that Plaintiff's reliance on the alleged misrepresentations was unreasonable as a matter of law.

III.    Count Five: Breach Of Contract

In Count Five of the FAC, titled "Breach of Contract (In The Alternative)," Plaintiff alleges that "to the extent the [Software] Agreement is found to be enforceable," Defendant breached § 10 (under which Defendant "committed to provide professional services and ensure implementation support in alignment with the agreed-upon Statements of Work") and/or § 11 (under which Defendant "warranted that the [Defendant] [S]oftware would perform in all material respects as described in [Defendant's] documentation, and that [Defendant] would use commercially reasonable efforts to resolve any [S]oftware performance issues") via Defendant's "failure to provide functional billing software and meet deadlines." (Doc. 14 ¶¶ 83-86.) Plaintiff further alleges that it "notified [Defendant] of these and other concerns on at least three (3) separate occasions, . . . including communications sent on October 9, 2024, December 23, 2024, and January 16, 2025," and Defendant "failed to cure the deficiencies and refused to work out a resolution." (*Id.* ¶¶ 88-89.) Plaintiff alleges that these breaches caused it to suffer various economic damages: "Not only did [Plaintiff] not have the bargained-for billing systems to capture all revenues that ought to have been generated on the scheduled basis, resulting in lost profitability, but [Plaintiff] was also forced to incur additional expenses to obtain replacement services. . . . [Plaintiff] was forced to find a replacement platform to mitigate damage, resulting in significant expense as well as lost revenues." (*Id.* ¶ 91.)

### A.    **The Parties' Arguments**

Defendant argues that Count Five fails to state a claim. (Doc. 17 at 7-10.) Specifically, Defendant argues that Plaintiff has alleged "three types of 'breach': (i) the Software's lack of functionality to meet [Plaintiff's] needs, so that it 'cannot be usefully

implemented in [Plaintiff's] business'; (ii) [Defendant's] 'failure to meet agreed-upon deadlines'; and (iii) [Defendant's] failure to 'cure the deficiencies.'" (*Id.* at 7.) Defendant argues that these allegations all relate to the capabilities of the Software, but "nothing in the express terms of the [Software] Agreement requires the Software to have those particular capabilities." (*Id.*) As for § 11, Defendant argues that it merely requires the Software to be periodically updated to mirror Defendant's "current release and updates," which has nothing to do with the functionality issues alleged by Plaintiff. (*Id.* at 7-8.) Defendant also argues that § 1 simply required it to provide access to ATS, LEAP, and StaffingFuel, and Plaintiff does not allege that such access was lacking. (*Id.* at 8.) Moreover, Defendant argues that the "Disclaimers" in § 11(c) all "undercut [Plaintiff's] claim of breach." (*Id.* at 8-9.) And Defendant argues that other of Plaintiff's allegations are "groundless." (*Id.* at 9.) For example, Defendant argues that its alleged failure to meet implementation deadlines is baseless because "[t]here are no 'implementation deadlines' referenced anywhere in the [Software] Agreement." (*Id.*) As for the alleged lack of functionality in "installed" Software, Defendant emphasizes that the Software Agreement provides that the Software will not be installed. (*Id.*) As for the alleged lack of "written confirmation" of acceptance, Defendant argues that the written-confirmation requirement only applies to services addressed in a SOW but Plaintiff "has not alleged that any SOWs were either created or executed." (*Id.*) Finally, Defendant argues that its alleged failure to rectify the Software issues was not a duty triggered under the terms of the Software Agreement. (*Id.* at 9-10.)

In response, Plaintiff argues that it has properly pleaded a claim for breach of contract in the alternative. (Doc. 22 at 14-15.) Plaintiff argues that Defendant did not provide Software that "function[s] as represented" under the terms of § 11(b) because Defendant falsely represented to Plaintiff during pre-contractual discussions that the Software would have, *inter alia*, direct billing capabilities and generate accounts receivable in a historical transactional database. (*Id.* at 14.) Plaintiff further argues that Defendant did not provide "commercially reasonable maintenance to resolve the issue[s]" with the

1    Software as required under § 11(a). (*Id.*) Plaintiff also argues that Defendant "agreed the

2    [S]oftware would go live in October 2024," and thus Defendant "breached the [Software]

3    Agreement by failing to deliver functioning [S]oftware by October 2024." (*Id.* at 14-15.)

4    Finally, Plaintiff argues that the "disclaimers" identified by Defendant "are simply

5    defenses to a few aspects of [Plaintiff's] breach of contract claim" but are "not a basis for

6    early dismissal of the entire claim." (*Id.* at 15.)

7         In reply, Defendant argues that Plaintiff's allegations are "not plausible" because

8    Plaintiff's "version of the facts [is] directly contradicted by the express language of the

9    parties' [Software] Agreement." (Doc. 25 at 3-4.) Ultimately, Defendant argues Plaintiff's

10   claims fail under Rule 8(a)(2). (*Id.* at 5.)

11        **B.    Analysis**

12        The parties do not dispute that, under § 29 of the Software Agreement, Count Five

13   is governed by Michigan law. (Doc. 17 at 6-7; Doc. 22 at 14 n.8.) In Michigan, a breach

14   of contract claim has three required elements: "(1) there was a contract, (2) the other party

15   breached the contract, and (3) the breach resulted in damages to the party claiming breach."

16   *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016). The

17   parties' dispute centers on whether the facts, as alleged in the FAC, sufficiently plead the

18   element of breach. At bottom, Defendant argues that Plaintiff's claims are contradicted by

19   the plain terms of the Software Agreement. The Court agrees. *Cf. Amir*, 606 F. Supp. 3d

20   at 666 ("Because Plaintiffs' breach of contract claims are belied by the terms of the actual

21   insurance contracts on which they are based, Plaintiffs' have not asserted plausible breach

22   of contract claims against Defendant.").

23        The FAC alleges that Defendant's "failure to provide functional billing software

24   and meet deadlines constitutes a material breach of at least Sections 10 and 11 of the

25   [Software] Agreement." (Doc. 14 ¶ 86.)

26        With respect to § 10, the FAC alleges that Defendant "committed to provide

27   professional services and ensure implementation support in alignment with the agreed-

28   upon Statements of Work." (*Id.* ¶ 84.) But § 10(a) merely provides that Plaintiff "*may*

retain [Defendant] to perform services ('Professional Services') pursuant to a written statement of work, work authorization form, or work order ('Statement of Work' or 'SOW') signed by both Parties."  (Doc. 17-1 at 11, emphasis added.)   The FAC conspicuously fails to identify any written statement of work, work authorization form, or work order in which Defendant "committed" itself "to provide professional services." *Cf. Amir*, 606 F. Supp. 3d at 666 ("In determining whether Plaintiffs have plausibly alleged such a claim, this Court is permitted to examine what Plaintiffs did not allege."). Accordingly, any alleged breached premised on § 10(a) is not plausible because the FAC does not allege the existence of any SOW that would trigger the applicability of § 10(a).

With respect to § 11, the FAC alleges that Defendant "warranted that the [Defendant] [S]oftware would perform in all material respects as described in its documentation, and that [Defendant] would use commercially reasonable efforts to resolve any [S]oftware performance issues."  (Doc. 14 ¶ 85.)  But the FAC's allegations do not directly suggest, or even support an inference, that the complained-of functionality issues were contrary to Defendant's "documentation."   Indeed, the FAC points to no "documentation" other than the Software Agreement itself.   And the complained-of functionality issues are either not addressed in the Software Agreement or are directly contradicted by terms of the Software Agreement.

For example, nearly all of Plaintiff's specific allegations about Defendant's "failure to provide functional billing software" relate to *invoicing* functionality.  (*Id.* ¶ 86(a)-(e), (h)-(i).)   But nowhere does the Software Agreement address or provide warranties regarding invoicing functionality. (Doc. 17-1 at 6-29.)  Plaintiff's other specific allegations address issues with expenses (Doc. 14 ¶ 86(f)-(g)), but that too is not mentioned in the Software Agreement (Doc. 17-1 at 6-29).  Indeed, Plaintiff's overarching complaint is that Defendant "fail[ed] to provide functional *billing* software" (Doc 14 ¶ 86, emphasis added), but the Software Agreement provides that the subscription license granted to Plaintiff is for "[Defendant's] healthcare *staffing* software" (Doc. 17-1 at 9 § 1, emphasis added), and the Software Agreement makes no mention of billing functionality.

- 40 -

As another example, one of Plaintiff's specific functionality complaints is that the Software does not allow Plaintiff to "directly bill . . . its customers." (Doc. 14 ¶ 34. *See also id.* ¶ 21 ["[Plaintiff] sought a provider that could implement a billing and CRM system to enable it to provide outward facing billing and invoicing to its clients, including direct billing . . . ."].)  However, multiple sections of the Software Agreement clarify that the license granted to Plaintiff is for *internal* business use only.  (Doc. 17-1 at 9 § 1 ["[Defendant] grants to [Plaintiff] and [Plaintiff] accepts from [Defendant], a . . . subscription license to access and use [Defendant's] healthcare staffing software . . . solely for [Plaintiff's] internal business use."]; *id.* at 13 § 11(c) ["[Plaintiff] acknowledges that . . . the Service and the Software . . . are for [Plaintiff's] internal commercial use only."].)

Moreover, § 11 of the Software Agreement provides that Defendant "warrants that . . . it will take commercially reasonable efforts so that the Software will perform in all material respects to provide the functionality of [Defendant's] current release and updates as they are issued." (*Id.* at 12 § 11(a).)  But the FAC does not allege that the complained-of functionality issues are functionalities that exist in the current release and/or updates of the Software.

To be sure, § 11 does provide that Defendant "represents and warrants that the Software will function *as represented* and is fit for the purpose it has been designed." (*Id.* at 12-13 § 11(b), emphasis added.)  And Plaintiff argues that the Software was represented—at least during the pre-contractual conversations—to have certain functionalities that it lacks.  In other words, Plaintiff argues that the Software was not "as represented" based on extra-contractual representations.  However, § 11(c) expressly provides that Plaintiff "represents that it is not relying on any representation of [Defendant] that is not expressly stated in this [Software] Agreement." (*Id.* at 13.)  And as discussed elsewhere, the complained-of functionality issues do not implicate any of the express representations in the Software Agreement.  (*Id.* at 6-29.)

The FAC also alleges that § 11 requires Defendant to "use commercially reasonable efforts to resolve any [S]oftware performance issues" (Doc. 14 ¶ 85) and that Defendant

breached this provision by "fail[ing] to cure the deficiencies and refus[ing] to work out a resolution" after receiving notice of Plaintiff's issues and concerns (*id.* ¶¶ 88-89). But again, that's not what the Software Agreement requires. Section 11(a) provides that Defendant will use "commercially reasonable efforts" to ensure that the Software "provide[s] the functionality of [Defendant's] current release and updates as they are issued." (Doc. 17-1 at 12.) As stated above, the FAC does not allege that the complained-of functionality issues are part of Defendant's current software release but were not part of the Software that Plaintiff received. Moreover, § 11(a) provides that if Plaintiff "promptly report[s] performance issues with the Software . . . [Defendant] will, *upon verifying a breach of this limited warranty provide, as [Plaintiff's] exclusive remedy,* commercially reasonable maintenance to resolve the issue *in conformity with this limited warranty*." (*Id.*, emphasis added.) But the FAC does not sufficiently plead why or how the complained-of functionality issues constitute a breach of the limited warranty or representations as described in the Software Agreement, such that Defendant's duty to resolve the issue was triggered under § 11(a). Unless and until Defendant verifies a breach of the limited warranty, it is under no duty to provide "commercially reasonable maintenance." And even once that duty *is* triggered, Defendant's only obligation is to bring the Software into conformity with the limited warranty.

Next, the FAC alleges that Defendant breached the Software Agreement by "fail[ing] to meet agreed-upon implementation deadlines" (Doc. 14 at ¶ 87)—namely, an "agreed-upon deadline" to "go live" by October 2024 (*id.* ¶ 37). But once again, there is no mention of an implementation, or "go-live," deadline of October 2024 anywhere in the Software Agreement. (Doc. 17-1 at 6-29.) At any rate, § 10(a) provides that "[a]ny dates for [Defendant's] performance specified in a SOW shall be estimates only." (*Id.* at 11 § 10(a).) Not only does the FAC fail to allege the existence of an applicable SOW, but even if it had, a deadline under that SOW would merely be an estimate.

The FAC also alleges that "[u]nder the terms of the [Software] Agreement, the services and products that [Defendant] agreed to provide were not to be deemed completed

until receiving written confirmation from [Plaintiff] that the services and products complied with [Plaintiff's] requirements" and that Plaintiff "never confirmed that [Defendant's] work, services and/or product deliverables met its requirements or were completed." (Doc. 14 ¶¶ 42-43.) But once again, that is not what the Software Agreement provides. Section 10(b) provides that "[e]xcept as otherwise mutually agreed in a SOW, [Plaintiff] accepts the Professional Services and associated work product upon written confirmation that it complies with [Plaintiff's] requirements as specific in the SOW." (Doc. 17-1 at 11 § 10(b).) As above, Plaintiff has not alleged the existence of any SOW that would trigger this requirement.

What's more, many of the FAC's breach allegations are premised on the failure of the Software to meet Plaintiff's specific business needs, but the FAC does not allege that (1) the Software Agreement itself required the Software to meet Plaintiff's business needs, or (2) that any SOW detailed Plaintiff's business needs. In fact, § 11(c) provides that Plaintiff would "assume[] all responsibility for determining whether the Service or the information generated thereby is accurate *or sufficient for customer's purposes.*" (*Id.* at 13 § 11(c), emphasis added.) Section 11(c) further provides that Plaintiff "accepts sole and complete responsibility for . . . the selection of the Software to achieve [Plaintiff's] intended results." (*Id.*) Section 11(c) also contains a disclaimer that "[t]here are no other warranties or conditions, express or implied by [Defendant] or its licensors, including without limitation . . . fitness for a particular purpose." (*Id.*)

*Closet World, Inc. v. Stiles Mach., Inc.*, 2022 WL 16636439 (W.D. Mich. 2022), cited by Plaintiff, does not compel a different outcome. There, the defendant "nowhere allege[d] that Plaintiff has failed to make out a claim for breach of the equipment and machinery sales agreement and/or the software sales agreement." *Id.* at *3. Defendant has emphatically raised such a claim here. Moreover, the court in *Closet World* appears to have declined to dismiss the breach of express warranty claim because it wasn't clear whether the "alleged defects pertain to disclaimed design defects rather than manufacturing defects." *Id.* at *4. But here, the parties are not arguing over whether the defects in the

Software are design defects or manufacturing defects such that the warranty limitations should or should not apply.

At bottom, Plaintiff has failed to plead sufficient facts to support a plausible claim for breach of contract.  Accordingly, Count Five is dismissed.

IV.    Count Four: Unjust Enrichment

In Count Four of the FAC, titled "Unjust Enrichment," Plaintiff alleges that Defendant "accepted payments totaling at least $39,500 from [Plaintiff], but failed to provide the promised products and services timely or in an acceptable fashion"; that Plaintiff "never confirmed receipt of acceptable performance"; that Defendant "is not justified in retaining the $39,500 payment because it was unwilling and/or unable to deliver the promised products and services that were offered to [Plaintiff] and that [Plaintiff] intended to acquire"; and that "[i]t would be unjust to allow [Defendant] to retain these funds and remain enriched without restitution to [Plaintiff], which would remain unjustly impoverished, not having received any discernable benefit."  (Doc. 14 ¶¶ 77-79.)

Defendant's motion addresses the unjust enrichment claim in just two sentences.  It states: "With respect to [Plaintiff's] claim of unjust enrichment, [Plaintiff] has pleaded the existence of the [Software] Agreement, and [Defendant] does not dispute it.  [Plaintiff's] claim for unjust enrichment cannot survive where the parties have an express contract."  (Doc. 17 at 10.)  Defendant cites two cases to support its position—one from Arizona and one from Michigan.  (*Id.*)  In response, Plaintiff relies exclusively on Arizona cases and argues that, under Rule 8, its unjust enrichment claim is properly pleaded in the alternative to its contract claim.  (Doc. 22 at 13.)  Defendant does not address unjust enrichment in its reply.  Neither party addresses which state's law governs the unjust enrichment claim specifically.

Given this backdrop, the only narrow dismissal argument before the Court is whether Plaintiff's claim for unjust enrichment is barred at the motion-to-dismiss stage because it seeks an alternative remedy to Plaintiff's contract claim.  In Arizona, "[a]n unjust enrichment count should not be dismissed unless it [is] insufficient apart from its

inconsistency with the other counts." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 832 (D. Ariz. 2016) (citation omitted). The same appears to be true in Michigan. *Solo v. United Parcel Service Co.*, 819 F.3d 788, 796 (6th Cir. 2016) (noting that Michigan courts will not imply a contract to prevent unjust enrichment "if there is already an express contract on the same subject matter," but that "Rule 8(a)(3) permits pleadings in the alternative when, for instance, there is a dispute between the parties as to whether an express agreement exists") (cleaned up). Here, Plaintiff has pleaded its contract claim in the alternative to its unjust enrichment claim. (Doc. 14 ¶ 83. *See also id.* ¶ 73 [alleging that the parties "have an active controversy over whether the [Software] Agreement is enforceable"]). Thus, Defendant has not established that Count Four should be dismissed at this early stage of the case.

## V.    Count Three: Declaratory Judgment

In Count Three of the FAC, titled "Declaratory Judgment," Plaintiff "seeks a judicial declaration that the [Software] Agreement is null, void, and unenforceable because of [Defendant's] fraud and/or negligent misrepresentations, and that the [Software] Agreement is hereby rescinded." (Doc. 14 ¶ 74.)

Defendant argues in a footnote that "[b]ecause [Plaintiff] has failed to allege any viable causes of action at Counts I, II, IV and V, Count III for Declaratory Judgment fails to state a claim upon which relief can be granted and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6)." (Doc. 17 at 5 n.3.) In response, Plaintiff agrees that "there must be an underlying cause of action to support a request for declaratory judgment" but argues it "has sufficiently pl[eaded] claims for fraudulent inducement and negligent misrepresentation." (Doc. 22 at 12.)

Plaintiff appears to concede that the survival of Count Three is contingent on the survival of Counts One and Two. Accordingly, because the Court has now dismissed Counts One and Two (not to mention Count Five), Count Three is dismissed as well.

## VI.    Attorneys' Fees

In its motion to dismiss, Defendant includes a request "for an award of reasonable

attorneys' fees and costs, pursuant to A.R.S. §§ 12-341 and 12-341.01." (Doc. 17 at 1, 17. *See also* Doc. 25 at 11 [same].)

This request is denied without prejudice as premature. As discussed above, not all of Plaintiff's claims have been dismissed. Moreover, as discussed below, Plaintiff is being granted leave to amend.

## VII.   Leave To Amend

Plaintiff has requested leave to amend "[i]f the Court determines that the FAC somehow fails to include enough specific information to satisfy the pleading standards set by the Federal Rules of Civil Procedure." (Doc. 22 at 15.) Although the Court is skeptical that Counts One, Two, Three, and Five can be amended to cure the deficiencies identified above, the Court will give Plaintiff an opportunity to attempt to do so, consistent with Rule 15(a)(2)'s textual mandate to "freely give leave" to amend and the Ninth Circuit's exhortation to apply this mandate with "extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citation omitted).

Accordingly,

**IT IS ORDERED** that:

1.   Defendant's motion to dismiss (Doc. 17) is **granted in part and denied in part**. Counts One, Two, Three, and Five of the FAC are dismissed with leave to amend.

2.   Plaintiff may file a Second Amended Complaint ("SAC") within 14 days of the issuance of this order. Any changes shall be limited to attempting to rectify the deficiencies identified in this order. Plaintiff shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

Dated this 30th day of December, 2025.

Dominic W. Lanza
United States District Judge